IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **INDICTMENT** |
| | ) | |
| Plaintiff, | ) | **4 : 20  CR  167** |
| | ) | |
| v. | ) | CASE NO._____ |
| | ) | Title 18, United States Code, |
| MARTIN ESCOBAR, | ) | Section 1347; Title 21, United |
| | ) | States Code, Sections 841(a)(1), |
| Defendant. | ) | (b)(1)(C), (b)(2), 856(a)(1) and |
| | ) | 859(a) |

## GENERAL ALLEGATIONS    JUDGE NUGENT

At all times relevant to this Indictment:

1.      Defendant MARTIN ESCOBAR was a medical doctor licensed by the State of Ohio Medical Board since 2001.

2.      Defendant operated Lake Shore Medical Center, an internal medicine and pain management practice in Lake Milton, Ohio, in the Northern District of Ohio, Eastern Division.

3.      The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions, the CSA made it "unlawful for any person knowingly or intentionally" to "distribute or dispense . . . a controlled substance" or conspire to do so.

4.      The term "controlled substance" meant a drug or other substance included in Schedules I, II, III, IV, and V of the CSA. The term "dispense" meant to deliver a controlled substance by, or pursuant to the lawful order of, a practitioner. It also included the prescribing and administering of a controlled substance. The term "distribute" meant to deliver (other than by administrating or dispensing) a controlled substance. The term "practitioner" meant a physician, medical doctor, dentist, or other person licensed, registered, or otherwise permitted by

the United States or the jurisdiction in which he or she practiced, to distribute or dispense a controlled substance in the course of professional practice.

5. Individual practitioners who wanted to distribute or dispense controlled substances in the course of professional practice were required to register with the Attorney General of the United States before they were legally authorized to do so.  Such individual practitioners were assigned a registration number by the United States Drug Enforcement Administration ("DEA").

6. Practitioners registered with the Attorney General were authorized under the CSA to write prescriptions for, or to otherwise dispense, Schedule II, III, IV, and V controlled substances, so long as they complied with the requirements of their registrations.  21 U.S.C. § 822(b).

7. As a medical doctor licensed in Ohio, Defendant was a "practitioner" within the meaning of the CSA.  He was also registered to prescribe controlled substances under DEA registration number BE7243025.

8. For medical doctors, compliance with the terms of their registrations meant that they could issue a prescription for a controlled substance to a patient only if the prescription was "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice." 21 C.F.R. § 1306.04(a).  A doctor violated the CSA and Code of Federal Regulations if he issued a prescription for a controlled substance outside the usual course of professional medical practice and not for a legitimate medical purpose.  21 C.F.R. § 1306.04(a).

9. The scheduling of controlled substances was based on each substance's potential for abuse, among other considerations.  Relevant to this Indictment, drugs that had a high

2

potential for abuse and could lead to severe psychological or physical dependence were classified as Schedule II controlled substances. Drugs that had a lower potential for abuse and could lead to limited physical or psychological dependence were classified as Schedule IV controlled substances. 21 U.S.C. § 812.

10.     Oxycodone, hydrocodone and morphine belonged to the opiate analgesic class of drugs used to treat moderate to severe pain. These drugs were commonly called opioids and were listed as Schedule II controlled substances with a high risk of addiction and abuse. Oxycodone was sold under the brand names OxyContin and Roxicodone. Oxycodone was combined with acetaminophen and sold under the brand name Percocet. Hydrocodone was combined with acetaminophen and sold under the brand name Norco. Morphine was sold under the brand name MS Contin.

11.     Dextroamphetamine–amphetamine belonged to the central nervous system stimulant class of drugs and was listed as a Schedule II controlled substance. It was used to treat attention deficit hyperactivity disorder and narcolepsy.  The drug was sold under the brand name Adderall.

12.     Diazepam, lorazepam and alprazolam belonged to a class of drugs called benzodiazepines and were listed as Schedule IV controlled substances. These drugs were used to treat anxiety, seizures, and insomnia. They were sold under brand names Valium, Ativan and Xanax.

13.     Controlled substances prescribed in certain dangerous combinations often produced dire effects on patients. In 2016, the United States Centers for Disease Control and Prevention ("CDC") recommended that physicians avoid prescribing opioids and benzodiazepines in combination - such as oxycodone, hydrocodone or morphine with diazepam,

3

lorazepam or alprazolam - whenever possible. Together, the drugs caused severe respiratory depression, including leading to death. Over 30% of opioid overdoses involved benzodiazepine use. On August 31, 2016, the United States Food and Drug Administration ("FDA") issued a "black box" warning for prescribing opioids in combination with benzodiazepines. The warning stated in part:

> FDA is warning patients and their caregivers about the serious risks of taking opioids along with benzodiazepines or other central nervous system (CNS) depressant medicines, including alcohol. Serious risks include unusual dizziness or lightheadedness, extreme sleepiness, slowed or difficult breathing, coma, and death. These risks result because both opioids and benzodiazepines impact the CNS, which controls most of the functions of the brain and body.

14.    Other controlled substance combinations also produced dangerous results. Opioids and stimulants prescribed together - such as hydrocodone, oxycodone or morphine and dextroamphetamine-amphetamine - produced a powerful depressant/stimulant effect.

15.    Prescription drugs, such as those containing the opioids hydrocodone, oxycodone and morphine, the benzodiazepines alprazolam, lorazepam and diazepam, and the stimulant dextroamphetamine-amphetamine, could be sold on the illegal secondary market, such as at the street level, for significant sums of money.

16.    Physicians tested the urine of patients to whom they prescribed controlled substances in order to monitor for the presence of non-prescribed controlled substances, which could negatively interact with prescribed controlled substances to cause injury to, or death of, patients. These tests also monitored for the presence of the controlled substances that the physicians were prescribing to their patients. When a urine drug screen failed to detect the presence of a prescribed drug, it suggested that the patient was not taking the drug as directed in the prescription. A negative drug screen, particularly if repeated in a subsequent office visit,

suggested that the patient was abusing the drug by taking it too frequently and in greater amounts than prescribed; or, that the patient was diverting the drug by selling it for profit on the illegal secondary market – such as at the street level. Defendant operated an in-house drug testing laboratory in his own medical office to test patients for the presence of prescribed drugs and other substances, and he billed the government for providing this service.

17.    Medicare provided medical insurance benefits to any person age 65 or older, to certain disabled persons, and to those with chronic renal disease who elected coverage. Medicare was a health care benefit program within the meaning of Title 18, United States Code, Sections 24(b) and 1347. Medicare Part B helped cover physician services, outpatient care, and supplies, when they were ordered by a doctor and medically necessary.

18.    Medicaid was a federal health care benefit program designated to provide medical services to certain individuals and families with low income as outlined in the Social Security Act (Title 42, United States Code, Section 1396 *et seq.*). Medicaid was a health care benefit program within the meaning of Title 18, United States Code, Sections 24(b) and 1347.

19.    While the Federal Government funded large portions of Medicaid, the program itself was largely administered by the states. The Ohio Department of Medicaid ("ODM") administered Medicaid in Ohio, and it received historically approximately 60% of its funds from federal sources. Ohio providers claimed Medicaid reimbursement from ODM pursuant to written provider agreements. ODM received, processed, and paid those claims according to Medicaid rules, regulations, and procedures.

20.    A Medicaid Managed Care Organization ("Medicaid MCO") was a private managed care organization that contracted with ODM pursuant to Ohio Revised Code Section

5164.85 to provide Medicaid services. Medicaid MCOs were health care benefit programs within the meaning of Title 18, United States Code, Sections 24(b) and 1347.

21.    Private health insurers ("private insurers") were also health care benefit programs under Title 18, United States Code, Sections 24(b) and 1347.

22.    Medicare, Medicaid, Medicaid MCOs, and private insurers prohibited payment for items and services that were not "reasonable and necessary" to diagnose and treat an illness or injury. Medicare claim forms, for example, required the provider who made a claim for services to certify that the services were "medically indicated and necessary for the health of the patient." Pursuant to the rules and regulations of the Ohio Medicaid Program, including Medicaid MCOs, Medicaid only paid for services that were actually performed by qualified individuals, were medically necessary, and provided in accordance with federal and state laws, rules and regulations. Medicaid, Medicaid MCOs, and private insurers similarly required providers to certify that services were medically necessary. Only claims that were medically necessary were entitled to reimbursement.

23.    The American Medical Association assigned and published five-digit codes, known as the Current Procedural Terminology ("CPT") codes. The codes were a systematic listing of procedures and services performed or ordered by health care providers. The purpose of the terminology was to provide uniform language that accurately described medical, surgical, and diagnostic services and supplies, thereby providing an effective means for reliable nationwide communication among physicians, patients, and third parties.

24.    Health care claim forms, both paper and electronic, contained certain patient information and service billing codes, including CPT codes. Health care programs had established payment schedules based on the codes billed by the provider. By designating a

certain code, the provider certified to the health care program that a given treatment was actually rendered in compliance with the code requirements and was medically necessary. These treatment billing codes were well known to the medical community, providers, and health care insurance companies. The procedures and services represented by CPT codes were health care benefits, items, and services within the meaning of Title 18, United States Code, Section 24(b). Defendant used the following CPT codes to bill for testing patients' urine for the presence of prescribed and non-prescribed controlled substances and other substances: 80307; 80361; 80320; 80335; 80358; 80345; 80356; 80365; 82575; 80353; 83986; 80324; 80346; and 80354.

25.     Medicare Part D was an optional program offered to Medicare recipients that helped cover prescription drug costs. Medicaid, Medicaid MCOs, and private insurers also provided prescription drug coverage for many of their members.

26.     Like the payment of outpatient or other services, Medicare, Medicaid, Medicaid MCOs, and private insurers would pay to fill drug prescriptions only if those prescriptions were medically necessary. Controlled substance prescriptions that were written outside the usual course of medical practice and not for a legitimate medical purpose were medically unnecessary and ineligible for payment.

27.     From approximately March 27, 2015, through May 8, 2019, Defendant prescribed controlled substances outside the usual course of professional practice and not for a legitimate medical purpose, and in doing so, engaged in the following conduct:

                a.     performed inadequate patient physical and historical examinations;

                b.     failed to establish evidence-based, objective diagnoses for patients' pain;

7

c. failed to establish and document in patient medical charts, the presence of intractable pain, and signs, symptoms and causes, and the nature of, the underlying diseases and pain mechanisms;

d. prescribed controlled substances without adequately investigating pain complaints, including by failing to perform or order appropriate diagnostic tests;

e. prescribed controlled substances without considering other treatment modalities;

f. failed to follow the CDC guideline that opioids are not first-line routine therapy for chronic pain;

g. failed to formulate and document individualized treatment plans in patient medical records;

h. failed to accurately document in patients' medical charts patients' responses to treatment;

i. failed to tailor prescription drug therapy to the individual needs of patients and modify treatment plans;

j. increased the dosage of controlled substances, and prescribed controlled substances for prolonged time periods, both without evidence of efficacy;

k. prescribed excessive doses of controlled substances;

l. failed to consult with medical specialists in treating patients, including spinal diagnosticians, physiatrists, and psychologists;

8

m.    ignored signs of patient addiction and drug abuse, and failed to

consult with an addiction medicine specialist or other substance abuse

professional to obtain a formal assessment of addiction and drug abuse;

n.    prescribed controlled substances, purportedly to treat psychiatric

conditions, without performing appropriate testing to accurately diagnose such

conditions, and without securing psychiatric diagnoses from mental health

professionals;

o.    prescribed opioids and benzodiazepines together without a

significant, valid medical diagnosis for either, and failed to follow the CDC

guideline that: "[c]linicians should avoid prescribing opioid medication and

benzodiazepines concurrently whenever possible;"

p.    prescribed opioids together with stimulants, both in significant

amounts;

q.    used false diagnoses to prescribe controlled substances;

r.    falsified patient pain intensity scales in patient medical charts in

order to justify prescribing controlled substances;

s.    used non-modified templates in patient charts, repopulated from

visit to visit, that contained false narratives of patient visits that falsely claimed

that extensive physical examinations were conducted;

t.    ignored the results of urine drug screens, many of which were

performed in Defendant's own in-house office laboratory, which demonstrated the

absence of prescribed controlled substances and the presence of non-prescribed

controlled substances, suggesting that the patients were abusing prescribed and

non-prescribed controlled substances, and selling prescribed controlled substances

on the illegal secondary market.

28.     Persons known to the Grand Jury who were patient customers of Defendant

included Patient 1, L.C., B.T., V.A., J.C., T.C.-1, G.L., J.H. and T.C.-2.

COUNTS 1–87
(Distribution of Controlled Substances, 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and (b)(2))

The Grand Jury charges:

29.     The factual allegations of paragraphs 1 through 16, and paragraphs 27 and 28, of

this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

30.     On or about the following dates in the Northern District of Ohio, Eastern

Division, Defendant MARTIN ESCOBAR knowingly and intentionally distributed and

dispensed Schedule II and Schedule IV controlled substances, as described by count in the table

below, by issuing prescriptions outside the usual course of professional practice and not for a

legitimate medical purpose:

| Count | Patient | Date Rx Written | Substance | Common Brand Name | Strength | Qty |
|---|---|---|---|---|---|---|
| 1 | Patient 1 | 11/28/2018 | Hydrocodone-Acetaminophen | Norco | 5/325 mg | 21 |
| 2 | Patient 1 | 1/8/2019 | Hydrocodone-Acetaminophen | Norco | 5/325 mg | 21 |
| 3 | Patient 1 | 1/8/2019 | Lorazepam | Ativan | 0.5 mg | 28 |
| 4 | Patient 1 | 2/22/2019 | Hydrocodone-Acetaminophen | Norco | 5/325 mg | 21 |
| 5 | Patient 1 | 2/22/2019 | Lorazepam | Ativan | 0.5 mg | 28 |
| 6 | Patient 1 | 3/21/2019 | Hydrocodone-Acetaminophen | Norco | 5/325 mg | 84 |
| 7 | Patient 1 | 3/21/2019 | Lorazepam | Ativan | 0.5 mg | 28 |
| 8 | Patient 1 | 4/18/2019 | Hydrocodone-Acetaminophen | Norco | 5/325 mg | 112 |
| 9 | Patient 1 | 4/18/2019 | Lorazepam | Ativan | 0.5 mg | 28 |
| 10 | Patient 1 | 5/8/2019 | Hydrocodone-Acetaminophen | Norco | 5/325 mg | 112 |
| 11 | Patient 1 | 5/8/2019 | Lorazepam | Ativan | 0.5 mg | 28 |
| 12 | L.C. | 10/22/2018 | Hydrocodone-Acetaminophen | Norco | 7.5/325 mg | 112 |
| 13 | L.C. | 10/22/2018 | Alprazolam | Xanax | 1 mg | 112 |
| 14 | L.C. | 11/19/2018 | Hydrocodone-Acetaminophen | Norco | 7.5/325 mg | 112 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 15 | L.C. | 11/19/2018 | Alprazolam | Xanax | 1 mg | 112 |
| 16 | L.C. | 12/17/2018 | Hydrocodone-Acetaminophen | Norco | 7.5/325 mg | 112 |
| 17 | L.C. | 12/17/2018 | Alprazolam | Xanax | 1 mg | 112 |
| 18 | L.C. | 1/14/2019 | Hydrocodone-Acetaminophen | Norco | 7.5/325 mg | 112 |
| 19 | L.C. | 1/14/2019 | Alprazolam | Xanax | 1 mg | 112 |
| 20 | L.C. | 2/11/2019 | Hydrocodone-Acetaminophen | Norco | 7.5/325 mg | 112 |
| 21 | L.C. | 2/11/2019 | Alprazolam | Xanax | 1 mg | 112 |
| 22 | B.T. | 3/7/2018 | Hydrocodone-Acetaminophen | Norco | 7.5/325 mg | 120 |
| 23 | B.T. | 3/7/2018 | Dextroamphetamine-Amphetamine | Adderall | 20 mg | 56 |
| 24 | B.T. | 5/24/2018 | Hydrocodone-Acetaminophen | Norco | 7.5/325 mg | 120 |
| 25 | B.T. | 5/24/2018 | Dextroamphetamine-Amphetamine | Adderall | 20 mg | 28 |
| 26 | B.T. | 7/19/2018 | Hydrocodone-Acetaminophen | Norco | 7.5/325 mg | 120 |
| 27 | B.T. | 7/19/2018 | Dextroamphetamine-Amphetamine | Adderall | 20 mg | 56 |
| 28 | B.T. | 9/13/2018 | Hydrocodone-Acetaminophen | Norco | 7.5/325 mg | 120 |
| 29 | B.T. | 9/13/2018 | Dextroamphetamine-Amphetamine | Adderall | 20 mg | 28 |
| 30 | B.T. | 12/6/2018 | Hydrocodone-Acetaminophen | Norco | 7.5/325 mg | 120 |
| 31 | B.T. | 12/6/2018 | Dextroamphetamine-Amphetamine | Adderall | 20 mg | 28 |
| 32 | V.A. | 9/20/2018 | Oxycodone | Roxicodone | 20 mg | 112 |
| 33 | V.A. | 9/20/2018 | Diazepam | Valium | 10 mg | 84 |
| 34 | V.A. | 11/15/2018 | Oxycodone | Roxicodone | 20 mg | 112 |
| 35 | V.A. | 11/15/2018 | Diazepam | Valium | 10 mg | 84 |
| 36 | V.A. | 12/13/2018 | Oxycodone | Roxicodone | 20 mg | 112 |
| 37 | V.A. | 12/13/2018 | Diazepam | Valium | 10 mg | 84 |
| 38 | V.A. | 1/10/2019 | Oxycodone | Roxicodone | 20 mg | 112 |
| 39 | V.A. | 1/10/2019 | Diazepam | Valium | 10 mg | 84 |
| 40 | V.A. | 2/7/2019 | Oxycodone | Roxicodone | 20 mg | 112 |
| 41 | V.A. | 2/7/2019 | Diazepam | Valium | 10 mg | 84 |
| 42 | J.C. | 2/26/2018 | Hydrocodone-Acetminophen | Norco | 10/325 mg | 112 |
| 43 | J.C. | 2/26/2018 | Diazepam | Valium | 10 mg | 28 |
| 44 | J.C. | 2/26/2018 | Dextroamphetamine-Amphetamine | Adderall | 10 mg | 56 |
| 45 | J.C. | 3/26/2018 | Hydrocodone-Acetminophen | Norco | 10/325 mg | 112 |
| 46 | J.C. | 3/26/2018 | Diazepam | Valium | 10 mg | 28 |
| 47 | J.C. | 3/26/2018 | Dextroamphetamine-Amphetamine | Adderall | 10 mg | 56 |
| 48 | J.C. | 5/21/2018 | Hydrocodone-Acctaminophen | Norco | 10/325 mg | 112 |
| 49 | J.C. | 5/21/2018 | Diazepam | Valium | 10 mg | 28 |
| 50 | J.C. | 5/21/2018 | Dextroamphetamine-Amphetamine | Adderall | 10 mg | 56 |
| 51 | J.C. | 6/18/2018 | Hydrocodone-Acetaminophen | Norco | 10/325 mg | 112 |

| 52 | J.C. | 6/18/2018 | Diazepam | Valium | 10 mg | 28 |
| 53 | J.C. | 6/18/2018 | Dextroamphetamine-Amphetamine | Adderall | 10 mg | 56 |
| 54 | J.C. | 7/16/2018 | Hydrocodone-Acetaminophen | Norco | 10/325 mg | 84 |
| 55 | J.C. | 7/16/2018 | Diazepam | Valium | 10 mg | 28 |
| 56 | T.C.-1 | 3/2/2018 | Oxycodone | Oxycontin | 30 mg | 140 |
| 57 | T.C.-1 | 3/2/2018 | Morphine | MS Contin | 30 mg | 56 |
| 58 | T.C.-1 | 3/2/2018 | Alprazolam | Xanax | 1 mg | 112 |
| 59 | T.C.-1 | 3/2/2018 | Dextroamphetamine-Amphetamine | Adderall | 20 mg | 56 |
| 60 | T.C.-1 | 3/28/2018 | Oxycodone | Oxycontin | 30 mg | 140 |
| 61 | T.C.-1 | 3/28/2018 | Morphine | MS Contin | 30 mg | 56 |
| 62 | T.C.-1 | 3/28/2018 | Alprazolam | Xanax | 1 mg | 112 |
| 63 | T.C.-1 | 3/28/2018 | Dextroamphetamine-Amphetamine | Adderall | 20 mg | 56 |
| 64 | T.C.-1 | 4/25/2018 | Oxycodone | Oxycontin | 30 mg | 140 |
| 65 | T.C.-1 | 4/25/2018 | Morphine | MS Contin | 30 mg | 56 |
| 66 | T.C.-1 | 4/25/2018 | Alprazolam | Xanax | 1 mg | 112 |
| 67 | T.C.-1 | 4/25/2018 | Dextroamphetamine-Amphetamine | Adderall | 20 mg | 56 |
| 68 | T.C.-1 | 5/23/2018 | Oxycodone | Oxycontin | 30 mg | 140 |
| 69 | T.C.-1 | 5/23/2018 | Morphine | MS Contin | 30 mg | 56 |
| 70 | T.C.-1 | 5/23/2018 | Alprazolam | Xanax | 1 mg | 112 |
| 71 | T.C.-1 | 5/23/2018 | Dextroamphetamine-Amphetamine | Adderall | 20 mg | 56 |
| 72 | T.C.-1 | 6/20/2018 | Oxycodone | Oxycontin | 30 mg | 140 |
| 73 | T.C.-1 | 6/20/2018 | Alprazolam | Xanax | 1 mg | 112 |
| 74 | G.L. | 7/13/2015 | Oxycodone | Roxicodone | 30 mg | 150 |
| 75 | G.L. | 7/13/2015 | Alprazolam | Xanax | 2 mg | 120 |
| 76 | G.L. | 10/30/2015 | Oxycodone | Roxicodone | 30 mg | 150 |
| 77 | G.L. | 10/30/2015 | Alprazolam | Xanax | 1 mg | 90 |
| 78 | G.L. | 3/16/2016 | Oxycodone | Roxicodone | 30 mg | 180 |
| 79 | G.L. | 3/16/2016 | Alprazolam | Xanax | 2 mg | 120 |
| 80 | G.L. | 4/20/2016 | Oxycodone | Roxicodone | 30 mg | 180 |
| 81 | G.L. | 4/20/2016 | Alprazolam | Xanax | 2 mg | 120 |
| 82 | J.H. | 3/27/2015 | Oxycodone-Acetaminophen | Percocet | 10/325 mg | 120 |
| 83 | J.H. | 3/27/2015 | Alprazolam | Xanax | 2 mg | 60 |
| 84 | J.H. | 5/11/2015 | Oxycodone-Acetaminophen | Percocet | 10/325 mg | 120 |
| 85 | J.H. | 5/11/2015 | Alprazolam | Xanax | 2 mg | 60 |
| 86 | J.H. | 6/17/2015 | Oxycodone-Acetaminophen | Percocet | 10/325 mg | 120 |
| 87 | J.H. | 6/17/2015 | Alprazolam | Xanax | 2 mg | 90 |

All in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and (b)(2).

## COUNT 88
(Distribution of Controlled Substance to a Person Under Twenty-One Years of Age,
21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 859(a))

The Grand Jury further charges:

31.    The factual allegations of paragraphs 1 through 16, and paragraphs 27 and 28, of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

32.    On or about April 13, 2018, in the Northern District of Ohio, Eastern Division, Defendant MARTIN ESCOBAR knowingly and intentionally distributed and dispensed oxycodone, a Schedule II controlled substance, by issuing a prescription outside the usual course of professional practice and not for a legitimate medical purpose to T.C.-2, a person under twenty-one years of age, whose identity is known to the Grand Jury, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and 859(a).

## COUNT 89
(Distribution of Controlled Substance, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C))

The Grand Jury further charges:

33.    The factual allegations of paragraphs 1 through 16, and paragraphs 27 and 28, of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

34.    On or about July 20, 2016, in the Northern District of Ohio, Eastern Division, Defendant MARTIN ESCOBAR knowingly and intentionally distributed and dispensed oxycodone, a Schedule II controlled substance, by issuing a prescription outside the usual course of professional practice and not for a legitimate medical purpose to G.L., a person whose identity is known to the Grand Jury, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

ENHANCED PENALTY UNDER TITLE 21
UNITED STATES CODE, SECTION 841(b)(1)(C)
(Death or Serious Bodily Injury Resulting from Use of Controlled Substance)

35.     The allegation of Count 89 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

36.     On or about July 22, 2016, in the Northern District of Ohio, Eastern Division, G.L., a person whose identity is known to the Grand Jury, did fatally ingest and overdose on a controlled substance, namely oxycodone, which Defendant had distributed and dispensed to G.L.

37.     As a result of Defendant's distribution of oxycodone, as alleged in Count 89, death did result from the use of oxycodone, a Schedule II controlled substance.

All in violation of the enhanced penalty provisions of Title 21, United States Code, Section 841(b)(1)(C).

COUNT 90
(Distribution of Controlled Substance, 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and (b)(2))

The Grand Jury further charges:

38.     The factual allegations of paragraphs 1 through 16, and paragraphs 27 and 28, of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

39.     On or about July 17, 2015, in the Northern District of Ohio, Eastern Division, Defendant MARTIN ESCOBAR knowingly and intentionally distributed and dispensed oxycodone, a Schedule II controlled substance, and alprazolam, a Schedule IV controlled substance, outside the usual course of professional practice and not for a legitimate medical purpose to J.H., a person whose identity is known to the Grand Jury, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and (b)(2).

14

ENHANCED PENALTY UNDER TITLE 21
UNITED STATES CODE SECTION 841(b)(1)(C)
(Death or Serious Bodily Injury Resulting from Use of Controlled Substance)

40.     The allegation of Count 90 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

41.     On or about July 19, 2015, in the Northern District of Ohio, Eastern Division, J.H., a person whose identity is known to the Grand Jury, did fatally ingest and overdose on controlled substances, namely oxycodone and alprazolam, which Defendant had distributed and dispensed to J.H.

42.     As a result of Defendant's distribution of oxycodone and alprazolam, as alleged in Count 90, death did result from the use of oxycodone, a Schedule II controlled substance, and alprazolam, a Schedule IV controlled substance.

All in violation of the enhanced penalty provisions of Title 21, United States Code, Section (b)(1)(C).

COUNT 91
(Maintaining Drug-Involved Premises, 21 U.S.C. § 856(a)(1))

The Grand Jury further charges:

43.     The factual allegations of paragraphs 1 through 16, and paragraphs 27 and 28, of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

44.     From on or about March 27, 2015, and continuing through May 8, 2019, in the Northern District of Ohio, Eastern Division, Defendant MARTIN ESCOBAR knowingly, intentionally and unlawfully opened, used and maintained a place known as Lake Shore Medical Center located at 17674 Mahoning Avenue, Lake Milton, Ohio, for the purpose of distributing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Section 856(a)(1).

15

COUNTS 92-145
(Health Care Fraud, 18 U.S.C. § 1347)

The Grand Jury further charges:

45.     The factual allegations of paragraphs 1 through 28 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

46.     From in or around January 29, 2018, through February 11, 2019, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant MARTIN ESCOBAR knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud health care benefit programs, as defined in Title 18, United States Code, Section 24(b), that is Medicare, Medicaid and a Medicaid MCO, and to obtain by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare, Medicaid and a Medicaid MCO in connection with the delivery of and payment for health care benefits, items, and services.

47.     As part of the scheme to defraud and obtain money and property, Defendant prescribed controlled substances outside the usual course of medical practice and not for a legitimate medical purpose, thus resulting in Medicare, Medicaid and a Medicaid MCO paying for medically-unnecessary controlled substances.

48.     It was further part of the scheme to defraud and obtain money and property, that Defendant had patients submit to urine drug screen tests, when these services were outside the usual course of medical practice and not for a legitimate medical purpose, thus resulting in Medicare, Medicaid and a Medicaid MCO paying for medically-unnecessary medical services.

49.     On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant MARTIN ESCOBAR executed and attempted to execute the

scheme described above by submitting and causing the submission of the claims for

reimbursement set forth below:

| Count | Beneficiary | Date of Service | Insurance | Claim Amounts | Description of Services |
|-------|-------------|-----------------|-----------|---------------|-------------------------|
| 92 | L.C. | 9/24/2018 | Medicaid | $330.00 | Urine drug screen - 80361, 80358, 80356, 80365, 80353, 83986, 80320, 80335, 80345, 80324, 80346 |
| 93 | L.C. | 9/24/2018 | Medicaid | $99.72 | Hydrocodone-Acetaminophen |
| 94 | L.C. | 9/24/2018 | Medicaid | $145.83 | Alprazolam |
| 95 | L.C. | 10/22/2018 | Medicaid | $240.00 | Urine drug screen - 80320, 80353, 80324, 80356, 80335, 80358, 80345, 80361 |
| 96 | L.C. | 10/22/2018 | Medicaid | $99.72 | Hydrocodone-Acetaminophen |
| 97 | L.C. | 10/22/2018 | Medicaid | $145.83 | Alprazolam |
| 98 | L.C. | 11/19/2018 | Medicaid | $390.00 | Urine drug screen - 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 83986, 82575, 80354 |
| 99 | L.C. | 11/19/2018 | Medicaid | $99.72 | Hydrocodone-Acetaminophen |
| 100 | L.C. | 11/19/2018 | Medicaid | $145.83 | Alprazolam |
| 101 | L.C. | 12/17/2018 | Medicaid | $390.00 | Urine drug screen - 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 83986, 82575, 80354 |
| 102 | L.C. | 12/17/2018 | Medicaid | $99.72 | Hydrocodone-Acetaminophen |
| 103 | L.C. | 12/17/2018 | Medicaid | $145.83 | Alprazolam |
| 104 | L.C. | 2/11/2019 | Medicaid | $390.00 | Urine drug screen - 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 83986, 82575, 80354 |
| 105 | L.C. | 2/11/2019 | Medicaid | $104.35 | Hydrocodone-Acetaminophen |
| 106 | L.C. | 2/11/2019 | Medicaid | $152.65 | Alprazolam |
| 107 | B.T. | 8/16/2018 | Medicaid | $130.00 | Urine drug screen - 80307, 82575 |
| 108 | B.T. | 8/16/2018 | Medicare | $14.83 | Hydrocodone/Acetaminophen |
| 109 | B.T. | 9/13/2018 | Medicaid | $130.00 | Urine drug screen - 80307, 82575 |
| 110 | B.T. | 9/13/2018 | Medicare | $14.83 | Hydrocodone/Acetaminophen |
| 111 | B.T. | 9/13/2018 | Medicare | $3.92 | Amphetamine/Dextroamphetamine |
| 112 | B.T. | 11/8/2018 | Medicaid | $130.00 | Urine drug screen - 80307, 82575 |

| 113 | B.T. | 11/8/2018 | Medicare | $15.18 | Hydrocodone/Acetaminophen |
|---|---|---|---|---|---|
| 114 | B.T. | 11/8/2018 | Medicare | $4.00 | Amphetamine/Dextroamphetamine |
| 115 | B.T. | 12/6/2018 | Medicare | $14.79 | Hydrocodone/Acetaminophen |
| 116 | B.T. | 12/6/2018 | Medicare | $4.12 | Amphetamine/Dextroamphetamine |
| 117 | B.T. | 1/7/2019 | Medicaid | $130.00 | Urine drug screen - 80307, 82575 |
| 118 | B.T. | 1/7/2019 | Medicare | $66.65 | Hydrocodone/Acetaminophen |
| 119 | B.T. | 1/7/2019 | Medicare | $21.08 | Amphetamine/Dextroamphetamine |
| 120 | V.A. | 10/18/2018 | Medicaid | $390.00 | Urine drug screen - 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 83986, 82575, 80354 |
| 121 | V.A. | 10/18/2018 | Medicaid | $125.54 | Oxycodone HCL |
| 122 | V.A. | 10/18/2018 | Medicaid | $26.94 | Diazepam |
| 123 | V.A. | 11/15/2018 | Medicaid | $390.00 | Urine drug screen - 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 83986, 82575, 80354 |
| 124 | V.A. | 11/15/2018 | Medicaid | $125.54 | Oxycodone HCL |
| 125 | V.A. | 11/15/2018 | Medicaid | $26.94 | Diazepam |
| 126 | V.A. | 12/13/2018 | Medicaid | $390.00 | Urine drug screen - 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 83986, 82575, 80354 |
| 127 | V.A. | 12/13/2018 | Medicaid | $125.54 | Oxycodone HCL |
| 128 | V.A. | 12/13/2018 | Medicaid | $26.94 | Diazepam |
| 129 | V.A. | 1/10/2019 | Medicaid | $390.00 | Urine drug screen - 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 83986, 82575, 80354 |
| 130 | V.A. | 1/10/2019 | Medicaid | $125.54 | Oxycodone HCL |
| 131 | V.A. | 1/10/2019 | Medicaid | $26.94 | Diazepam |
| 132 | V.A. | 2/7/2019 | Medicaid | $390.00 | Urine drug screen - 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 83986, 82575, 80354 |
| 133 | V.A. | 2/7/209 | Medicaid | $125.54 | Oxycodone HCL |
| 134 | V.A. | 2/7/2019 | Medicaid | $26.94 | Diazepam |

| 135 | J.C. | 1/29/2018 | Medicaid | $360.00 | Urine drug screen – 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 82575, 83986 |
| 136 | J.C. | 4/23/2018 | Medicaid | $360.00 | Urine drug screen – 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 82575, 83986 |
| 137 | J.C. | 5/21/2018 | Medicaid | $360.00 | Urine drug screen – 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 82575, 83986 |
| 138 | J.C. | 5/21/2018 | Medicaid | $90.45 | Hydrocodone-Acetaminophen |
| 139 | J.C. | 5/21/2018 | Medicaid | $98.98 | Dextroamphetamine-Amphetamine |
| 140 | J.C. | 5/21/2018 | Medicaid | $9.93 | Diazepam |
| 141 | J.C. | 6/18/2018 | Medicaid | $390.00 | Urine drug screen – 80320, 80324, 80335, 80345, 80346, 80353, 80356, 80358, 80361, 80365, 82575, 83986, 80354 |
| 142 | J.C. | 6/18/2018 | Medicaid | $107.07 | Hydrocodone-Acetaminophen |
| 143 | J.C. | 6/18/2018 | Medicaid | $98.98 | Dextroamphetamine-Amphetamine |
| 144 | J.C. | 6/18/2018 | Medicaid | $9.93 | Diazepam |
| 145 | J.C. | 7/16/2018 | Medicaid | $81.05 | Hydrocodone-Acetaminophen |

All in violation of Title 18, United States Code, Section 1347.

## FORFEITURE

The Grand Jury further charges:

50.     The allegations contained in Counts 1 through 145 of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein for the purpose of alleging forfeiture pursuant to the provisions of Title 21, United States Code, Section 853 (controlled substance offenses) and Title 18, United States Code, Section 982(a)(7) (health care fraud scheme).  As a result of these offenses, Defendant MARTIN ESCOBAR shall forfeit to the United States: (i) any and all property constituting, or derived from, any proceeds Defendant obtained, directly or indirectly, as the result of the controlled substance offenses (Counts 1-91); (ii) any and all of Defendant's property used – or intended to be used – in any manner or part, to

19

commit or to facilitate the commission of the controlled substance offenses (Counts 1-91); and,

(iii) any and all property – real and personal – that constitutes or is derived, directly or indirectly,

from gross proceeds traceable to the commission of the health care fraud scheme (Counts 92-

145).

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government

Act of 2002.

20